IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| WILLIAM McMEIN EHART, JR., | ) | CIVIL NO. 21-00475 SOM-KJM |
| Individually and as Personal | ) | |
| Representative of MAUREEN | ) | ORDER DENYING MOTION TO |
| ANNE EHART, deceased, | ) | DISMISS; ORDER GRANTING |
| | ) | MOTION TO STRIKE |
| Plaintiff, | ) | AFFIRMATIVE DEFENSES |
| | ) | ASSERTING WAIVER/RELEASE |
| vs. | ) | AND ASSUMPTION OF THE RISK |
| | ) | |
| LAHAINA DIVERS INC.; | ) | |
| CORY DAM; | ) | |
| KAITLIN MILLER; and | ) | |
| JULIANNE CRICCHIO, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER DENYING MOTION TO DISMISS;**
**ORDER GRANTING MOTION TO STRIKE AFFIRMATIVE DEFENSES**
**ASSERTING WAIVER/RELEASE AND ASSUMPTION OF THE RISK**

I.        INTRODUCTION.

Maureen Anne Ehart and her husband, Plaintiff William

McMein Ehart, Jr., went on a chartered SCUBA and snorkeling boat

tour to Molokini Crater, a crescent-shaped volcanic atoll located

about 2.5 miles off the south coast of Maui, Hawaii.  Maureen

Ehart disappeared while snorkeling on that tour and is presumed

to have died.  William Ehart, individually and as personal

representative of Maureen Ehart's estate, has brought this

wrongful death action, naming as Defendants 1) Lahaina Divers

Inc., the owner of the boat; 2) Cory Dam, the captain of the tour

boat; 3) Kaitlin Miller, a SCUBA instructor on the tour; and

4) Julianne Cricchio, a SCUBA instructor on the tour.  The

Complaint failed to name as a Defendant the operator of the tour

boat and the employer of the individual Defendants, Lahaina Dive & Surf LLC.[1]

Before the court are two motions.  In the first, the SCUBA instructors (Miller and Cricchio) seek dismissal of the claims asserted against them, arguing that the facts alleged in the Complaint do not support any viable claim against them. Their motion is denied because the facts alleged plausibly support negligence claims against them.

In the second motion, William Ehart seeks to strike affirmative defenses asserting waiver and release and assumption of the risk.  That motion is granted.

## II.      BACKGROUND.

Molokini Crater is a popular location for diving and snorkeling south of Maui, Hawaii, as it is a marine life conservation district and bird sanctuary.  It is an unpopulated

---

[1] The Complaint incorrectly identified Defendants Kait Irene and Jules Cricchio.  Kaitlin Miller and Julianne Cricchio have indicated that they are the correct Defendants.  For purposes of the present motion, this court deems all references in the Complaint to Kait Irene and Jules Cricchio to be references to Kaitlin Miller and Julianne Cricchio.  The parties have also indicated that Lahaina Dive & Surf LLC should be added as a party.  Plaintiff is given leave to file an Amended Complaint to correctly identify the parties and to add Lahaina Dive & Surf LLC as a Defendant.  Any such Amended Complaint must be filed no later than May 31, 2022.  Defendants should respond in accordance with court rules.  Defenses stricken by the present order should not be reasserted, but the absence of them in response to a pleading filed after the filing of this order shall not constitute an abandonment of the defenses.  Rather, such absence shall reflect the law of the case.

partially submerged volcanic crater located approximately 2.5 miles off Maui. *See* https://molokinicrater.com/ (last visited May 9, 2022).

On September 14, 2021, the Eharts went on a chartered SCUBA and snorkeling tour to Molokini Crater. They boarded the boat, *Dauntless*, at Lahaina Harbor and traveled on the *Dauntless* to Molokini Crater along with 14 other paying passengers. *See* Complaint ¶ 15, ECF No. 1, PageID # 6. According to the Complaint, the *Dauntless* had a three-person crew. The crew included Dam, who was the master of the *Dauntless* and the person in charge of the charter boat trip, as well as Miller and Cricchio, open-water SCUBA instructors certified by the Professional Association of Diving Instructors ("PADI"). *See id.* ¶¶ 9-11, 14, PageID #s 5-6.

At the hearing on the present motion, counsel for Lahaina Divers clarified that Lahaina Divers owned the *Dauntless,* while Lahaina Dive & Surf chartered the tour and employed Dam, Miller, and Cricchio. *See also* ECF No. 21-1 n.1, PageID # 94.

Before boarding the *Dauntless*, the Eharts signed a waiver. *See* ECF No. 32-5, PageID # 239-40; ECF No. 32-5, PageID #s 246-47. They released "LAHAINA DIVE & SURF, LLC, AND/OR LAHA[I]NA DIVERS INC. (LDS/LDI), AND ITS OWNERS, EMPLOYERS, AGENTS AND ASSIGNS FOR PERSONAL INJURIES OR WRONGFUL DEATH THAT MAY [OCCUR] DURING THE FORTHCOMING DIVE ACTIVITY AS A RESULT OF

THE INHERENT RISKS ASSOCIATED WITH SCUBA DIVING AND/OR SNORKELING
OR AS A RESULT OF NEGLIGENCE." *Id.* The waiver then instructed
the Eharts to check boxes. The following are the boxes that
Maureen Ehart checked (William Ehart checked all of the boxes):



(Check off each of the following sections as you read them. If you do not scuba dive, check only those items marked by the * symbol.) *

☐ 1. I acknowledge that I am a certified diver trained in safe diving practices

☑ * 2. I am aware of the risks inherent in this scuba diving and/or snorkeling and I accept these risks

☐ 3. I affirm that I am in good mental and physical fitness for diving, and that I am not under the influence of alcohol, nor am I under the influence of drugs that are contraindicatory to scuba diving. If I am taking medication, I affirm that I have seen a physician and have approval to scuba dive while under the influence of the medication/drugs

☐ 4. I am aware of the dangers of breath holding while scuba diving, and will not hold LDS/LDI and related entities (such as employees, instructors, certified assistants, boat operators, or diver agencies) responsible if I am injured doing so.

☐ 5. I am aware that I will be expected to scuba dive with a buddy, and it will be our responsibility to plan a dive allowing for our diving limitations and the prevailing water conditions. I will not hold the above listed businesses or individuals responsible for my failure to safely plan my dive.

☐ * 6. I will inspect all of my equipment prior to the activity and will notify the above listed businesses and/or individuals if any of my equipment is not working properly. I will not hold the above listed businesses or individuals responsible for my failure to inspect my equipment prior to scuba diving or snorkeling.

☑ * 7. I acknowledge that I am physically fit to scuba dive and/or snorkel. and I will not hold the above listed businesses or individuals responsible if I am injured as a result of heart, lung, ear, or circulatory problems or other illnesses that occur while scuba diving and/or snorkeling.

☑ 8. I understand that even though I follow all of the appropriate dive practices. there is still some risk of my sustaining decompression sickness, embolism or other hyperbaric injuries, and I expressly assume the risk of said injuries.

☑ 9. I also expressly assume the risk and accept the responsibility to plan my scuba dive and dive my plan.

☑ * 10. I also understand that scuba diving and/or snorkeling are physically strenuous activities and that I will be exerting myself during this diving excursion, and then if I am injured as a result of heart attack, panic, hyperventilation, etc., that I expressly assume the risk of said injuries and that I will not hold the above listed businesses or individuals responsible for the same.

☑ * 11. I also understand that on this open-water diving trip, I will be at a remote site and that there will not be immediate medical care or hyperbaric care available to me, and I expressly assume the risk of diving in such a remote spot.

☑ * 12. IT IS MY INTENTION BY THIS INSTRUMENT TO EXEMPT. RELEASE AND HOLD HARMLESS LDS/LDI AND ALL RELATED ENTITIES AS DEFINED ABOVE FROM ALL LIABILITY WHATSOEVER FOR PERSONAL INJURY, PROPERTY DAMAGE. AND WRONGFUL DEATH CAUSED BY NEGLIGENCE.

**I HAVE FULLY INFORMED MYSELF OF THE CONTENTS OF THIS INFORMATION AND RELEASE BY READING IT BEFORE I SIGNED IT ON BEHALF OF MYSELF AND MY HEIRS.**

According to the Complaint, Dam, Miller, and Cricchio "planned, organized, approved, and conducted" the SCUBA and snorkeling charter boat trip.  *See id.* ¶ 16, PageID # 6.

The *Dauntless* went across water to Molokini Crater, which meant the boat remained on the water, as the crater is partially submerged.  The boat tied up to a mooring buoy on the east side of the crater.  *See id.* ¶ 16, PageID # 6.  At the hearing on the motion, William Ehart argued that Defendants had admitted in their answer that Molokini Crater was a protected area with more than two dozen permanent moorings at which passengers could get on and off boats.  However, in paragragh 16 of the Answer, Lahaina Divers and Dam admit only that vessels can disembark and reembark passengers at 16 to 20 moorings at Molokini Crater, not that the moorings are permanent or that Molokini Crater is a protected anchorage.

Miller escorted one group of divers on a 40-minute SCUBA tour, while Cricchio escorted another group on a similar SCUBA tour.  *See id.* ¶ 17, PageID #s 6-7.  Maureen Ehart was not in either group.  After the SCUBA divers, including William Ehart, began their dives, Maureen Ehart and two others went from the boat into the water to snorkel.  *See id.* ¶ 18, PageID # 7; ECF No. 32-4, PageID # 230 (police report indicating that William Ehart told police that he was on his SCUBA tour when his wife entered the water to go snorkeling).

Dam remained on the *Dauntless*, allegedly to:

a.  Maintain an anchor watch;

b.  Serve as a topside lookout and maintain a bubble watch;

c.  Monitor the radio, the currents, and the weather;

d.  Supervise the passengers' snorkeling activities;

e.  Act as a lifeguard;

f.  Recall the divers and snorkelers if necessary;

g.  And unmoor and get the vessel underway by himself should the situation require it.

*See* Complaint ¶ 17, PageID # 7.

According to the Complaint, the wind, waves, and current increased, and the two other snorkelers returned to the *Dauntless*. Maureen Ehart, however, continued snorkeling alone. *See id.* ¶ 19, PageID # 7. At some point, Maureen Ehart disappeared. *See* ECF No. 32-4, PageID # 229 (police report indicating that Dam said he lost sight of Maureen Ehart when he took his eyes off of her for about one minute to help the SCUBA divers back onto the boat).

The Complaint alleges that, instead of recalling the SCUBA excursions, reporting a missing passenger to the Coast Guard, or conducting an immediate search for Maureen Ehart, Dam waited for both SCUBA tours to return to the boat and then ordered Miller and Cricchio to look for her. *See id.* ¶¶ 20-21,

6

PageID #s 8-9.  The Complaint alleges that this search was poorly planned, as Miller and Cricchio had no paddle boards or buoys to give them a better vantage point and were unable to effectively communicate with anyone while they searched for Maureen Ehart. *See id.* ¶ 22, PageID # 9.

The Complaint alleges that Dam called the Coast Guard to ask for assistance only after Miller and Cricchio failed to locate Maureen Ehart.  *See id.* ¶ 23, PageID # 9.  The Coast Guard searched for Maureen Ehart for three days, but she was never found.  *See id.* ¶¶ 23-24, PageID #s 9-10.

The Complaint asserts six causes of action:

1) A Wrongful Death Claim against Lahaina Divers and Dam based on alleged gross negligence;

2) A Wrongful Death Claim against Miller and Cricchio based on alleged simple negligence;

3) A Survival Claim against Lahaina Divers and Dam (damages sustained by Maureen Ehart from the time of the alleged gross negligence until her death);

4) A Survival Claim against Miller and Cricchio (damages sustained by Maureen Ehart from the time of the alleged simple negligence until her death);

5) A Reckless Infliction of Emotional Distress Claim against Lahaina Divers and Dam; and

7

6) A Negligent Infliction of Emotional Distress Claim against Miller and Cricchio.

**III.      ANALYSIS.**

> **A.    The SCUBA Instructors' Motion to Dismiss is Denied.**

>> **1.    Standard.**

On a Rule 12(b)(6) motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.  *See Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996).  However, conclusory allegations of law, unwarranted deductions of fact, and unreasonable inferences are insufficient to defeat a motion to dismiss.  *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

"[T]o survive a Rule 12(b)(6) motion to dismiss, factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true even if doubtful in fact." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss

does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### 2. **Analysis.**

The parties do not dispute that the claims asserted in the Complaint arise in admiralty, and the court agrees. *See Matter of Pac. Adventures, Inc.*, 5 F. Supp. 2d 874, 877-78 (D. Haw. 1998). "Federal courts have authority to develop a substantive body of general maritime law applicable to cases within the admiralty and maritime jurisdiction. The general maritime law affords redress for injuries and damage caused by negligence." *Sutton v. Earles*, 26 F.3d 903, 912 (9th Cir. 1994) (citation and brackets omitted)

To recover for maritime negligence, a plaintiff must establish "(1) duty; (2) breach; (3) causation; and (4) damages." *Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948, 953 (9th Cir. 2011). The duty that applies in maritime negligence cases is

that of reasonable care under the circumstances.  *See Peters v. Titan Nav. Co.*, 857 F.2d 1342, 1345 (9th Cir. 1988).  "The degree of care required is always that which is reasonable, but the application of reasonable will of course change with the circumstances of each particular case."  *In re Catalina Cruises, Inc.*, 137 F.3d 1422, 1425 (9th Cir. 1998) (stating that a shipowner owes a duty of reasonable care to those aboard a ship who are not crew members).

In essence, Miller and Cricchio argue that they owed no duty of care to Maureen Ehart, as they were SCUBA instructors who were escorting others on SCUBA tours when Maureen Ehart entered the water to snorkel and then disappeared.  They argue that the Complaint's allegations with respect to their failure to comply with PADI standards are insufficient because no specific standard has been identified.  *See* ECF No. 24-1, PageID #s 99-100.  To the extent the Complaint alleges that their search was untimely, they contend that the allegations support no claim against them because they were leading SCUBA tours when Maureen Ehart disappeared, and they searched for her only after the captain ordered them to do so.  *Id.*, PageID # 101.  They further argue that their failure to find Maureen Ehart does not support a negligence claim because they had no duty to find her.  *Id.*, PageID #s 101-02.  Finally, they argue that their failure to use paddle boards in their search is insufficient to support a breach

of any duty because there is no allegation that there were paddle boards available to them.  *Id.*, PageID # 102.

The SCUBA instructors ignore a number of allegations in the Complaint.  In evaluating the Complaint on a Rule 12(b)(6) motion, the court accepts as true the facts asserted and concludes that William Ehart has alleged sufficient facts supporting a possible breach of a duty of care.  *See Coyoy v. City of Eloy*, 859 F. App'x 96, 97 (9th Cir. 2021) (examining whether a complaint alleged facts sufficient to plausibly support a breach of a duty of care); *Spizzirri v. JPMorgan Chase Bank, NA*, 592 F. App'x 599, 600 (9th Cir. 2015) (examining whether a complaint "plausibly allege[d] that the defendants owed . . . a duty of care").

The Complaint plausibly alleges that the SCUBA instructors breached their duty of care in several respects.  In paragraph 28 of the Complaint, for example, the Complaint alleges that all Defendants (Lahaina Divers, Dam, Miller, and Cricchio) had a duty to provide:

> a. A vessel that was manned, equipped, and operated in accordance with the requirements of its Certificate of Inspection and in compliance with 46 C.F.R. Subchapter T;
>
> b. Safe and suitable snorkeling, scuba-diving, passenger-safety, and rescue procedures;
>
> c. Crew members, lifeguards, dive masters, open water scuba instructors, and snorkeling supervisors who were properly trained,

certified, and equipped for their respective
jobs;

d. A safe, suitable, and properly supervised
time and place for the scubadiving and
snorkeling excursions that Plaintiff and
DECEDENT had booked; [and]

e. And a timely and effective rescue to any
passenger whom they knew or should have known
to be in peril.

In relevant part, the Complaint alleges that all
Defendants planned, organized, approved, and conducted the SCUBA
and snorkeling trip that tragically ended with Maureen Ehart's
disappearance.  *See* Complaint ¶ 16, PageID # 6.  It alleges that
Lahaina Divers and Dam failed to use an appropriate degree of
care in adopting, implementing, and enforcing safe and suitable
snorkeling, SCUBA, and rescue procedures, and in supervising the
snorkeling activities at issue.  *See* Complaint ¶ 29(e) and (f).
In the second cause of action (a simple negligence claim against
Miller and Cricchio), the Complaint incorporates those
allegations by reference and asserts that Miller and Cricchio
also failed to comply with those duties.  *See id.* ¶¶ 35-36,
PageID # 16.  The Complaint then further asserts that Miller and
Cricchio were negligent in failing to comply with PADI membership
standards and in failing to timely and effectively conduct a
rescue effort.  *Id.* ¶ 37.  The Complaint also alleges that the
search was poorly planned and improperly equipped.  *Id.* ¶ 22,
PageID # 9.

12

The Complaint plausibly alleges that, as SCUBA instructors and crew members of the *Dauntless*, Miller and Cricchio had a duty to plan and implement the SCUBA and snorkeling excursion such that it was safe and such that Maureen Ehart was properly supervised while snorkeling.  The Complaint also plausibly alleges that Miller and Cricchio had a duty to properly plan for the foreseeable situation in which a passenger went missing, requiring them to execute a rescue plan in a timely and effective manner.  This court is not ruling that Miller and/or Cricchio actually had such duties, only that the facts alleged plausibly support such duties.  Nor is the court ruling that such duties arise under any PADI standard or Coast Guard regulation.  This court leaves for further adjudication at trial or via some other motion the issue of whether the actual facts support such duties.  On the present motion, the court is accepting as true the allegation that the SCUBA instructors had such duties in this case.

In so doing, this court is well aware that it is often said that whether a duty exists is a question of law.  *See Martinez v. Korea Shipping Corp.*, 903 F.2d 606, 609 (9th Cir. 1990) ("The existence and extent of a duty of care are questions of law, but proximate cause and whether such a duty has been breached are questions of fact."); *Contango Operators, Inc. v. United States*, 9 F. Supp. 3d 735, 741 (S.D. Tex. 2014) (stating

13

that the duty owed in a negligence case brought under admiralty law is a question of law for the court to decide), *aff'd sub nom. Contango Operators, Inc. v. Weeks Marine, Inc.*, 613 F. App'x 281 (5th Cir. 2015); *see also Janssen v. Am. Hawaii Cruises, Inc.*, 69 Haw. 31, 34, 731 P.2d 163, 165 (1987) ("The existence of a duty is a question of law.").  The problem in the present case is that duties may or may not exist based on facts that have not been established in the record.  This court, accepting as true the Complaint's factual allegations, cannot say that the alleged duties are absent as a matter of law.  In maritime cases, a court considers whether a duty of reasonable care exists, but the circumstances of a case affect what is reasonable.  *See In re Catalina Cruises, Inc.*, 137 F.3d at 1425.

Because the Complaint plausibly alleges a breached duty on the part of the SCUBA instructors, their motion to dismiss is denied.

> **B.   William Ehart's Motion to Strike Lahaina Divers' and Dam's Second Affirmative Defense Is Granted in Light of 46 U.S.C. § 30509.**
>
> **1.   Standard.**

Rule 12(f) of the Federal Rules of Civil Procedure states that a district court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise

14

from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (quotation marks and citation omitted). In considering a motion to strike, the court "views the challenged pleadings in the light most favorable to the [opposing party]." *Wailua Assocs. v. Aetna Cas. & Sur. Co.*, 183 F.R.D. 550, 554 (D. Haw. 1998). A Rule 12(f) motion to strike is a "severe measure and is generally viewed with disfavor." *United States v. 729.773 Acres of Land*, 531 F. Supp. 967, 971 (D. Haw. 1982). However, a motion to strike a defense may be granted when a defense is clearly insufficient. *Id.*

## 2.  **Analysis.**

Lahaina Divers and Dam have asserted waiver and release as their Second Affirmative Defense. *See* ECF No. 20, PageID # 73. William Ehart seeks to strike this defense, arguing that it is void under part of the Shipowner's Limitation of Liability Act, 46 U.S.C. § 30509(a), which states:

> (1) The owner, master, manager, or agent of a vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country, may not include in a regulation or contract a provision limiting--(A) the liability of the owner, master, or agent for personal injury or death caused by the negligence or fault of the owner or the owner's employees or agents.

Any such provision is void. 46 U.S.C. § 30509(a)(2) ("A provision described in paragraph (1) is void."). Because

§ 30509(a)(1)(A) prohibits waivers with respect to vessels transporting passengers between ports in the United States, the court rules that the waiver signed by the Eharts is void. Accordingly, the motion to strike the second defense is granted.

In striking the defense, this court acknowledges the multiple cases that Defendants cite in arguing that the waivers the Eharts signed are enforceable.  For example, *Shultz v. Florida Keys Dive Center, Inc.*, 224 F.3d 1269 (11th Cir. 2000), *Olivelli v. Sappo Corporation*, 225 F. Supp. 2d 109, 119 (D.P.R. 2002), and *Jerome v. Water Sports Adventure Rentals and Equiptment*, 2013 WL 1499046 (D.V.I. Apr. 12, 2013), all determined that § 30509 (or its predecessor statute) was inapplicable to waivers involving recreational ocean sport activities.

In *Shultz v. Florida Keys Dive Center, Inc.*, 224 F.3d 1269 (11th Cir. 2000), the Eleventh Circuit determined that the predecessor statute to § 30509, 46 U.S.C. § 183c(a), did not prohibit waivers of negligence claims arising out of SCUBA activities from a dive boat.  In other words, the waiver in *Shultz* was enforceable unless there was some other reason not to enforce it.  Under § 183c(a) (as under § 30509), it was

> unlawful for the manager, agent, master, or
> owner of any vessel transporting passengers
> between ports of the United States or between
> any such port and a foreign port to insert in
> any rule, regulation, contract, or agreement
> any provision or limitation (1) purporting,

> in the event of loss of life or bodily injury
> arising from the negligence or fault of such
> owner or his servants, to relieve such owner,
> master, or agent from liability, or from
> liability beyond any stipulated amount, for
> such loss or injury . . . .

Shultz had sued the Florida Keys Dive Center and some of its employees after his wife apparently drowned during a SCUBA trip conducted by the dive center.  224 F.3d at 1270.  Shultz sought to invalidate the waiver he and his wife had signed under § 183c(a).  The Eleventh Circuit rejected the application of § 183c(a), reasoning that the vessel at issue was "only as a dive boat: it departed the port of Tavernier in the Florida Keys, brought the divers to the location of the dive, and after the dive returned them to Tavernier.  It was not a 'vessel transporting passengers between ports of the United States or between any such port and a foreign port.'"  *Id.* at 1271.

In ruling that the Shultzes' waivers were not void under § 30509's predecessor, the Eleventh Circuit stated:

> The legislative history supports the
> interpretation . . . that the statute does
> not cover the liability release signed by
> Patricia Shultz.  Congress enacted § 183c(a)
> in 1936 to "put a stop to" practices like
> "providing on the reverse side of steamship
> tickets that in the event of damage or injury
> caused by the negligence or fault of the
> owner or his servants, the liability of the
> owner shall be limited." H.R. Rep. No.
> 74-2517, at 6-7 (1936)[;] H.R. Rep. No.
> 74-2517, at 6-7 (1936); S. Rep. No. 74-2061,
> at 6-7 (1936)[;] S. Rep. No. 74-2061, at 6-7
> (1936).  That "practice" that Congress
> intended to outlaw was much different than

17

          the practice here--requiring a signed
          liability release to participate in the
          recreational and inherently risky activity of
          scuba diving.

*Id.*

     *Olivelli v. Sappo Corporation*, 225 F. Supp. 2d 109, 119 (D.P.R. 2002), relied on *Shultz* in declining to invalidate a waiver pursuant to § 183c(a) with respect to a wrongful death action asserted against a dive instructor and his employer arising out of a SCUBA accident.

     In *Jerome v. Water Sports Adventure Rentals and Equipment*, 2013 WL 1499046 (D.V.I. Apr. 12, 2013), the plaintiff sued Watersports Adventure Rentals and Equipment, Inc., dba Island Flight Adventures, for injuries sustained during a jet ski and snorkeling tour.  The district court determined that § 30509 did not apply to void a release because the case did not involve a "'vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country' as required by § 30509(a)(1).  Instead, the plaintiff was injured during a recreational jet ski and snorkeling tour provided by IFA."  *Id.* at * 7.

     The rulings of *Shultz*, *Olliveri*, and *Jerome* purport to embody the simple rule that dive boats differ from steamships, and that Congress was not thinking of dive boat excursions when it enacted § 183c(a) (now § 30509).  But the actual language of

§ 30509 and its purpose suggest a different result in the present case.

Section 30509 voids the waivers the Eharts signed only if all of the statute's terms are satisfied. *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 835 (9th Cir. 2002), is instructive. In *Wallis*, the Ninth Circuit refused to apply § 183c to a cruise that "did not touch a United States port." The Ninth Circuit reasoned that § 183c plainly did not apply when the vessel was not transporting passengers between ports of the United States or between any such port and a foreign port. *Id.* This court similarly turns to whether the facts of this case satisfy the language of § 30509 in light of the basic canons of statutory construction.

It is well established that "issues of statutory construction are questions of law." *Nelson v. Heiss*, 271 F.3d 891, 893 (9th Cir. 2001); *Barona Grp. of Capitan Grande Band of Mission Indians v. Am. Mgmt. & Amusement, Inc.*, 840 F.2d 1394, 1401 (9th Cir. 1987). A statute's language is the starting point for its interpretation. *See Dyer v. United States*, 832 F.2d 1062, 1066 (9th Cir. 1987). This court interprets undefined statutory terms by giving them their ordinary meanings. *See FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011) ("When a statute does not define a term, we typically give the phrase its ordinary meaning" (internal quotation marks and citation omitted)); *Animal Legal*

*Def. Fund v. United States Dep't of Agric.*, 933 F.3d 1088, 1093 (9th Cir. 2019) (same); *accord Mohamad v. Palestinian Auth.*, 566 U.S. 449, 454 (2012) ("Because the TVPA does not define the term 'individual,' we look first to the word's ordinary meaning.").

The Ninth Circuit has explained that, in determining the ordinary meaning of a word, courts usually consult dictionary definitions.  When the word has a plain meaning or is unambiguous, the statutory interpretation inquiry ends.  *See Animal Legal Def. Fund*, 933 F.3d at 1093.

Of course, as the Supreme Court has recognized, when "the literal reading of a statutory term would compel an odd result, . . . we must search for other evidence of congressional intent to lend the term its proper scope." *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 454 (1989) (quotation marks and citation omitted).  The Supreme court has explained:

> Looking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it seems inconsistent with Congress' intention, since the plain-meaning rule is rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.

*Id.* (quotation marks and citation omitted).  In other words, "[t]he plain meaning governs unless a clearly expressed legislative intent is to the contrary . . . , or unless such plain meaning would lead to absurd results." *Dyer*, 832 F.2d at 1066 (citation omitted).

20

Section 30509(a)(1)(A) prohibits (1) an "owner, master, manager, or agent of a vessel" that is (2) "transporting passengers between ports in the United States" from (3) limiting liability for "personal injury or death caused by the negligence or fault of the owner or the owner's employees or agents."  The first and third elements are not in issue here.  Lahaina Divers and Dam have admitted that Lahaina Divers is the owner of the *Dauntless*.  *See* Answer ¶ 8, ECF No. 20, PageID # 67 ("Defendants admit that Lahaina Divers owned the dive boat Dauntless . . . ."). They further admit that "Dam was the master of the vessel." *Id.* ¶ 10, PageID # 68.  Nor is there any dispute that the *Dauntless* qualifies as a "vessel."  *See id.* ¶ 4, PageID # 66 (calling the *Dauntless* a "dive vessel").  Finally, there is no dispute that the Eharts signed a waiver that limited Lahaina Divers' and Lahaina Dive & Surf's liability for personal injury or death caused by negligence.  *See* ECF No. 32-5, PageID # 239-40; ECF No. 32-5, PageID #s 246-47.

The court thus turns to the second element of the statute--whether Lahaina Divers, Lahaina Dive & Surf, and/or Dam were "transporting passengers between ports in the United States."  There is no dispute that the Eharts were "passengers." In Paragraph 4 of Lahaina Divers' and Dam's Answer, for example, they admit that Maureen Ehart was a "passenger-for-hire" for purposes of 46 C.F.R. § 70.10-1, which defines "passenger-for-

hire" as "a passenger for whom consideration is contributed as a condition of carriage on the vessel, whether directly or indirectly flowing to the owner, charterer, operator, agent, or any other person having an interest in the vessel."  In paragraph 10 of Lahaina Divers' and Dam's Answer, Lahaina Divers and Dam similarly admit that the Eharts "were aboard the Dauntless along with fourteen other paying passengers when the vessel . . . left Lahaina Harbor."  *See* ECF No. 20, PageID # 68.  The Opposition to the motion to strike also characterizes the Eharts as "paying passengers."  ECF No. 39, PageID # 286.

### a.    The *Dauntless* Was "Transporting Passengers."

Defendants argue that the *Dauntless* was not "transporting passengers," and therefore that § 30509 is inapplicable and the Eharts' waivers are enforceable unless otherwise prohibited.  While Defendants essentially argue that the *Dauntless* was not acting as a common carrier, the plain language of § 30509 does not limit its application to common carriers.  To the contrary, Congress has explicitly stated that the statute "applies to seagoing vessels and vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters."  46 U.S.C. § 30502.[2]  Consistent with

_____

[2] Defendants themselves have sought application of the Shipowner's Limitation of Liability Act to the case, specifically 46 U.S.C. § 30505 (providing a limitation of certain liabilities of an owner of a vessel to "the value of the vessel and pending

§ 30502, § 30509 only requires that a vessel be "transporting passengers," not that it act as a common carrier.  *See Matter of Pac. Adventures, Inc.*, 5 F. Supp. 2d 874, 879 (D. Haw. 1998) ("Section 183c is not limited to common carriers but applies to 'all vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters.'" (quoting 46 U.S.C. App. § 188.)).

While the statute does not define "transporting," its ordinary meaning is satisfied under the facts presented here. The American Heritage Dictionary of the English Language defines "transport" as "[t]o move or carry (goods, for example) from one place to another; convey." https://www.ahdictionary.com/word/search.html?q=transport (last visited May 9, 2022).  The Merriam-Webster dictionary similarly defines "transport" as "to transfer or convey from one place to another."   https://www.merriam-webster.com/dictionary/transport (last visited May 9, 2022).

The Opposition to the Motion to Strike argues that the *Dauntless* was just a dive boat and that its purpose was not to transport passengers like a common carrier, but instead to take divers and snorkelors from Lahaina Harbor to a dive spot and then

---

freight").  *See* Twelfth Affirmative Defense, ECF No. 20, PageID # 75.  It is not clear why this court should use different definitions under § 30505 versus under § 30509.  Under § 30502, neither section is expressly limited to common carriers.

return them to the Lahaina Harbor after their recreational excursion.  This narrow construction does not represent the ordinary meaning of "transporting passengers."  As noted above, there is no dispute that the Eharts were "passengers" on the *Dauntless*.  Nor is there any dispute that the *Dauntless* was conveying the Eharts from Lahaina Harbor to Molokini Crater and then intended to return them to Lahaina Harbor.  This satisfies the plain meaning of "transporting"; the Eharts were being conveyed from one place to another.

>           **b.    The *Dauntless* Was Transporting
>                   Passengers "Between Ports of the United
>                   States."**

In arguing that § 30509 is inapplicable and that the Eharts' waivers are therefore enforceable, Defendants note that the *Dauntless* was conveying passengers from Lahaina Harbor to a dive spot and then back to Lahaina Harbor.  Because the starting and ending points involve the same port, Defendants contend that the *Dauntless* was not transporting passengers "between ports," as required by § 30509.  William Ehart, on the other hand, argues that traveling between different ports (Port A to Port B) is not necessary for § 30509 to apply and that roundtrip travel from a port and back to the same port (Port A to Port A) is sufficient. He alternatively argues that the mooring buoy at Molokini Crater constitutes a port such that the voyage was, in fact, between Port A (Lahaina Harbor) and Port B (the mooring buoy).  This

court agrees that transporting passengers on a vessel traveling from Port A and then back to Port A is sufficient to satisfy § 30509's "between ports" requirement such that the waivers the Eharts signed are void because § 30509's elements are all satisfied.  The court therefore need not reach the argument that the mooring buoy constitutes a port.

The American Heritage Dictionary of the English Language defines "between" as "[i]n or through the position or interval separating" and "[c]onnecting spatially." https://www.ahdictionary.com/word/search.html?q=between (last visited May 9, 2022).  The Merriam-Webster dictionary similarly defines "between" as "in the time, space, or interval that separates."  https://www.merriam-webster.com/dictionary/between (last visited May 9, 2022).

The American Heritage Dictionary of the English Language defines "port" as:

> 1. a. A place on a waterway with facilities for loading and unloading ships.
>
> b. A city or town on a waterway with such facilities.
>
> c. The waterfront district of a city.
>
> 2. A place along a coast that gives ships and boats protection from storms and rough water; a harbor.
>
> 3. A port of entry.

https://www.ahdictionary.com/word/search.html?q=port (last visited May 9, 2022).

The Merriam-Webster dictionary similarly defines "port" as:

> 1 : a place where ships may ride secure from storms : HAVEN
>
> 2a : a harbor town or city where ships may take on or discharge cargo
>
> b : AIRPORT
>
> 3 : PORT OF ENTRY

https://www.merriam-webster.com/dictionary/port (last visited May 9, 2022).

In its *Glossory of Shipping Terms* at 80, the United States Department of Transportation similarly defines "port" as a "[h]arbor with piers or docks."

https://www.maritime.dot.gov/sites/marad.dot.gov/files/docs/resources/3686/glossaryfinal.pdf (last visited May 9, 2022).

Black's Law Dictionary (11th ed. 2019) defines "port" as "1. A harbor where ships load and unload cargo. 2. Any place where persons and cargo are allowed to enter a country and where customs officials are stationed."[3]

---

[3] As noted above, this court does not reach the issue of whether the mooring buoy at Molokini Crater constitutes a port as defined in another chapter of the United States Code governing telecommunications.  There, Congress defined "harbor" or "port" as "any place to which ships may resort for shelter or to load or unload passengers or goods, or to obtain fuel, water, or supplies."  47 U.S.C. § 153.

While § 30509 uses the plural "ports," this does not necessarily mean that different ports must be involved.  As noted above, when "the literal reading of a statutory term would compel an odd result, . . . we must search for other evidence of congressional intent to lend the term its proper scope." *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 454 (1989) (quotation marks and citation omitted).  Here, applying "ports" only when journeys are between Port A and Port B leads to odd and absurd results.  For example, a vessel may take passengers a few hundred yards from one side of a river to the other (Port A to Port B).  Waivers of negligence for the short journey between Port A and Port B would be prohibited by § 30509, as the journey would involve transportation of passengers "between ports of the United States."  However, if the same vessel left Port A for a 10-hour sightseeing tour and then returned to the same port (Port A), then, under Defendants' argument, waivers of negligence for such a journey would not be prohibited by § 30509.  It makes little sense to think that Congress intended to prohibit a waiver only for the first (very brief) journey.  Both involve the transportation of passengers between ports.  In the latter example, the vessel is conveying the passengers from one port out for a boat tour and then back to the same port, with the tour being the interval between embarkation and disembarkation at the same port.

Had Congress intended to require different ports when it used the word "ports," it could have easily indicated that by using the phrase "between different ports."  It did not do so. Congress could have also clarified that it meant "ports" to include the same or different ports by using the phrase "between the same or different ports."  Again, it did not do so.  Because this court's job in interpreting the meaning of "between ports" is to facilitate congressional intent when absurd results might follow or when there is ambiguity in a statute, this court looks to § 30509's legislative history.  Nothing in the ordinary meaning of the words "between ports" renders those words exclusive to voyages involving two distinct ports (Port A to Port B).  Instead, the word "between" allows a port to be spatially and temporally connected to itself by an intervening tour.  That is, Port A may be connected to Port A by the voyage taken from the initial port that then returns to the same port.

Congressional testimony with respect to § 183c(a) indicates that, in response to the Owners' Liability Act, which increased the liability of shipowners, operators of passenger vessels started printing limitations of liability on the back of tickets.  *See*, *e.g.*,  Cong. Record-House at 8575 (1936); Cong. Record-Senate at 8438 (June 1, 2936); *see also* Hearings Before the Committee on Merchant Marine and Fisheries H.R. 9969, Part 4, Amending the Limited Liability Act at 3 (1936) ("The proposed

amendments are necessitated by the immediate measures that were taken by steamship owners to evade the privileges and benefits of that new liability law.  Because of the increased liability they are now inserting on the back of passenger tickets their own private limitations of liability, some in nominal amounts, some in larger amounts, but, nevertheless, not the sufficient amount which was the intent of this committee to decree the steamship owners should be liable for."); *but see id.* at 116 (testimony denying that the limitation provisions were inserted on the back of tickets only after the new law was enacted).

During testimony before Congress with respect to § 183c, the infamous *General Slocum* disaster from several decades earlier was discussed.  *See* Hearings Before the Committee on Merchant Marine and Fisheries, House of Representatives, Seventy Fourth Congress, Second Session on H.R. 9969 at 23 (1936). According to the Report of the United States Commission of the Investigation Upon the Disaster to the Steamer "General Slocum" (Oct. 8, 1904), 957 of the 1,388 passengers and crew of the *General Slocum* died when the vessel caught fire in New York Harbor on June 15, 1904.  Congress examined the circumstances of this disaster.  *See* Evidence Before the Committee on Claims of the House of Representatives on H.R. 4154 for the Relief of the Victims of the General Slocum disaster (Apr. 20, 1910).  The *General Slocum* was chartered to take up to 1,500 passengers from

29

the harbor to a picnic area and back. *See id.* at 3-4. The fire started shortly after the trip began. Apparently, the life preservers were rotten and the fire safety apparatus did not work. This meant that many passengers either died from the fire or smoke or jumped overboard and drowned, not knowing how to swim. *Id.*

More than 30 years after the *General Slocum* disaster, testimony before Congress with respect to § 183c still referred to the event. For example, discussions about older excursion vessels taking passengers on daily excursions in New York Harbor included references to the *General Slocum* disaster. Concern was raised that passengers going out on a day's excursion were permitted to go on those outings without knowing in advance which ones were safe and which were not. *See* Hearings Before the Committee on Merchant Marine and Fisheries, House of Representatives, Seventy Fourth Congress, Second Session on H.R. 9969 at 36 (1936). Thus, in enacting § 183c, Congress was well aware of vessels taking passengers on day trips to and from the same port.

Against this backdrop, the House and Senate Reports with respect to § 183c's voiding of waivers noted the testimony regarding the "practice of providing on the reverse side of steamship tickets that in the event of damage or injury caused by the negligence or fault of the owner or his servants, the

liability of the owner shall be limited to a stipulated amount."
S.R. 74-2061 (May 12, 1936); H.R. 74-2517 (Apr. 28, 2936).  The
reports indicated that § 183c(a) "is intended to, and in the
opinion of the committee will, put a stop to **all** such practices
and practices of like character."  *Id.* (emphasis added).  In
other words, Congress intended to put a stop to all waivers by
passengers being transported by ship, not just waivers with
respect to passenger transportation from one port to a different
port.  Given the express intent by Congress to "put a stop to all
such practices and practices of like character," this court
applies § 30509 not only to the transportation of passengers
between Port A and a different port but also to the
transportation of passengers from Port A (provided it is in the
United States) on an excursion that returns to Port A even if
there is no intervening different port.

    This is essentially what one judge in this district
recognized in *Courtney v. Pacific Adventures*, 5 F. Supp. 2d 874,
879 (1998), which also involved a dive boat accident.  That case
rejected an argument that § 183c(a) was inapplicable because the
dive boat transported the plaintiff to and from the same port.
The judge reasoned that § 183c(a) was not so limited, stating,
"The provision stating 'between ports of the United States or
between any such port and a foreign port' means that there must
be a nexus between the voyage and the United States."  *Id.*

31

In *Hambrook v. Smith*, 2015 WL 3480887, *5 (D. Haw. June 2, 2015), that same judge applied his earlier *Courtney* holding to invalidate a waiver of negligence claims against a different dive company involved in a diving accident.  Neither *Courtney* nor *Hambrook* was appealed.  The present judge views those cases as consistent with the intent of Congress to bar "all" waivers with respect to the transportation of passengers.

This court has already acknowledged the Eleventh Circuit's contrary statement of congressional intent in *Shultz*. *See* 224 F.3d at 1271.  Under *Shultz*, whether a waiver is void or enforceable under § 30509 turns on when the negligence occurred or what a person on a vessel was doing, not on whether a vessel was transporting passengers between ports.  According to the Eleventh Circuit's reasoning, § 30509 would not void a waiver signed by a passenger who drowned while being transported to a dive spot if the vessel sank on the way there (assuming the "between ports" element was satisfied).  But allowing a waiver under those circumstances would contravene the intent of Congress to void waivers by passengers injured in the process of being transported.  There is no good reason to differentiate between a waiver signed by a passenger who drowns while being transported to a dive spot when a vessel sinks from a waiver signed by a passenger who gets off a vessel at a dive spot and then drowns while diving.  Congress wanted to prohibit waivers involving

passenger transportation and to "put a stop to all such practices and practices of like character."

The Eleventh Circuit itself has subsequently invalidated a waiver executed in favor of a cruise ship that was transporting passengers between a port in the United States and a foreign port when a passenger was injured while on a simulated surfing and body-boarding activity on the cruise ship.  *See Johnson v. Royal Caribbean Cruises, Ltd.*, 449 Fed. App'x 846, 848-49 (11th Cir. 2011).  In *Johnson*, the Eleventh Circuit recognized that the statute did not make exceptions with respect to the type of activity underlying a waiver.

Because the *Dauntless* was transporting the Eharts (paying passengers) between a port of the United States and the same port, and because all of the other elements of § 30509 are satisfied, the court rules that the Eharts' waiver is void under § 30509.  Accordingly, the court strikes Defendants' affirmative defense asserting waiver and release.

> **3.   Plaintiff Fails to Demonstrate That the Waiver and Release Affirmative Defense Should Also Be Stricken Based on Section 663-1.54 of Hawaii Revised Statutes.**

William Ehart also seeks to strike the waiver and release defense on the ground that it is void under section 663-1.54 of Hawaii Revised Statutes.  That statute provides:

> (a) Any person who owns or operates a business providing recreational activities to the public, such as, without limitation,

33

scuba or skin diving, sky diving, bicycle tours, and mountain climbing, shall exercise reasonable care to ensure the safety of patrons and the public, and shall be liable for damages resulting from negligent acts or omissions of the person which cause injury.

(b) Notwithstanding subsection (a), owners and operators of recreational activities shall not be liable for damages for injuries to a patron resulting from inherent risks associated with the recreational activity if the patron participating in the recreational activity voluntarily signs a written release waiving the owner or operator's liability for damages for injuries resulting from the inherent risks.  No waiver shall be valid unless:

    (1) The owner or operator first provides full disclosure of the inherent risks associated with the recreational activity; and

    (2) The owner or operator takes reasonable steps to ensure that each patron is physically able to participate in the activity and is given the necessary instruction to participate in the activity safely.

(c) The determination of whether a risk is inherent or not is for the trier of fact.  As used in this section an "inherent risk":

    (1) Is a danger that a reasonable person would understand to be associated with the activity by the very nature of the activity engaged in;

    (2) Is a danger that a reasonable person would understand to exist despite the owner or operator's exercise of reasonable care to eliminate or minimize the danger, and is generally beyond the control of the owner or operator; and

(3) Does not result from the negligence,
gross negligence, or wanton act or omission
of the owner or operator.

Haw. Rev. Stat. Ann. § 663-1.54 (West).

When situations arise that are not governed by legislation or admiralty precedent, federal courts may look to state statutory and common law to "borrow" as the appropriate federal admiralty rules. *See Richard v. Anadarko Petroleum Corp.*, 850 F.3d 701, 709 (5th Cir. 2017) (recognizing that "state law may occasionally be utilized to fill the gaps in an incomplete and less than perfect maritime system" (quotation marks and citation omitted)).  For example, in *Hambrook v. Smith*, 2016 WL 4498991 (Aug. 17, 2016), the court borrowed Hawaii's law on negligence when issuing post-trial findings of fact and conclusions of law with respect to a fatal SCUBA diving accident.

Even assuming that this court should borrow section 663-1.54 to supplement admiralty law, William Ehart fails to establish that all of section 663-1.54's requirements for voiding the waivers at issue have been established.  Section 663-1.54(a) provides that owners and operators of businesses providing SCUBA recreation "shall be liable for damages resulting from negligent acts or omissions of the person which cause injury."  However, section 663-1.54(b) provides that they "shall not be liable for damages for injuries to a patron resulting from inherent risks associated with the recreational activity" so long as certain

conditions are satisfied.  Those conditions include "full disclosure of the inherent risks" and taking "reasonable steps to ensure that each patron is physically able to participate in the activity and is given the necessary instruction to participate in the activity safely."  This court cannot find as a matter of law based on the pleadings alone that these conditions have or have not been satisfied.  Moreover, section 663-1.54(c) provides that "determination of whether a risk is inherent or not is for the trier of fact."

Under these circumstances, even assuming section 663-1.54 applies, William Ehart fails to establish based on the allegations in the pleadings that it voids the waivers at issue here.  In so ruling, the court recognizes that William Ehart mentioned the summary judgment standard in filing his motion and even submitted a concise statement.  However, there remains on the present record a question of fact about whether section 663-1.54(b)'s conditions were satisfied, including whether there was "full disclosure of the inherent risks" and whether the Tour Operator took "reasonable steps to ensure that [Maureen Ehart was] physically able to participate in the activity and [was] given the necessary instruction to participate in the activity safely."

C. **William Ehart's Motion to Strike Lahaina Divers' and Dam's Third Affirmative Defenses Is Granted.**

Lahaina Divers and Dam assert assumption of the risk in their Third Affirmative Defense. *See* ECF No. 20, PageID # 73. At the hearing, the parties agreed that this affirmative defense should be stricken. *See also* ECF No. 39, PageID # 285 ("Defendants do not oppose the motion as to implied assumption of risk."). Accordingly, the court strikes the assumption of the risk affirmative defense.

IV. **CONCLUSION.**

For the reasons stated above, the court denies the motion to dismiss filed by the SCUBA instructors (Miller and Cricchio). However, the court grants William Ehart's motion to strike the affirmative defenses of waiver and release and assumption of the risk.

Within one week of the entry of this order, the parties are directed to contact the Magistrate Judge assigned to this case to conduct a settlement conference.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 10, 2022.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

*Ehart v. Lahaina Dive & Surf LLC*, Civ. No. 21-00493 SOM-KJM; ORDER DENYING MOTION TO DISMISS; ORDER GRANTING MOTION TO STRIKE AFFIRMATIVE DEFENSES ASSERTING WAIVER/RELEASE AND ASSUMPTION OF THE RISK